UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


CHRISTOPHER PIERSEE,          )
                                    )
            Petitioner,       )
                                    )
      vs.                   )        Case No. 4:14-cv-990-AGF
                                    )
JAY CASSADY,              )
                                    )
            Respondent.     )


## MEMORANDUM AND ORDER

This matter is before the Court on the pro se petition of Missouri state prisoner

Christopher Piersee for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.   On August

26, 2009, Petitioner pleaded guilty to two counts of first-degree murder and was thereafter

sentenced to concurrent sentences of life without the possibility of parole.   In his petition

for federal habeas relief, Petitioner raises two ineffective assistance of counsel claims: (1)

plea counsel was ineffective because he failed to hire a forensic psychiatrist to establish

that Petitioner was incompetent to plead guilty on August 26, 2009; and (2) plea counsel

was ineffective because he failed to hire a forensic psychiatrist to establish that, at the time

Petitioner committed the murders, he suffered from a mental disease or defect that

prevented him from having the capacity to form the intent necessary to commit first-degree

murder.   For the reasons set forth below, federal habeas relief will be denied.

# BACKGROUND

On or about February 2, 2009, Petitioner killed his wife and six-month-old son in their home in La Grange, Missouri. Three weeks prior, Petitioner began ingesting excessive amounts of Coricidin HBP, a cold medicine containing dextromethorphan, which can produce dissociative hallucinogenic states when ingested at doses much higher than those medically recommended. On the night of February 2, 2009, Petitioner shot his wife in the head and inflicted blunt force trauma to the head of his infant son, killing both. On the morning of February 3, 2009, Petitioner's father-in-law discovered the bodies of Petitioner's wife and infant son and Petitioner, who was naked, covered in blood, and on the bed. Petitioner had a number of self-inflicted wounds on his arms. Petitioner's father-in-law held Petitioner at gunpoint until the authorities arrived.

Petitioner was immediately taken into custody and transported to a hospital. There, Petitioner was prescribed a number of medications, including Risperdal, Lorazepam, Paxil, and Ativan,[1] to manage his symptoms of depression and psychosis, and he remained in the hospital for 24 days before being transferred to jail. Petitioner attempted suicide on three occasions while in jail after returning from the hospital. ECF No. 10-1 at 12.

The State charged Petitioner with two counts of the class A felony of murder in the first degree and one count of the unclassified felony of armed criminal action. After meeting with Petitioner and in light of the serious nature of the charges, plea counsel hired forensic psychologist Jeffry Kline, Ph.D., to evaluate Petitioner's mental state, and Dr.

---

[1] Risperdal is an antipsychotic medication; Ativan and Lorazepam are tranquilizing agents; and Paxil is an anti-depressant. ECF No. 8, Ex. B at 136.

Kline provided plea counsel with a written report.   ECF No. 10-2.   The report contains

the following information.   On June 16, 2009, Dr. Kline performed a mental evaluation of

Petitioner for the purpose of determining Petitioner's mental state at that time, as well as at

the time of the murders.   Dr. Kline reviewed a number of records, including medical

records from the hospital and records from the Missouri State Highway Patrol.   Dr. Kline

reported on Petitioner's family, educational, employment, military, relationship,

psychiatric, and alcohol and substance abuse history.   He also went through a detailed

description of the murders based on documents obtained from the Missouri State Highway

Patrol.

Dr. Kline observed that during the examination, Petitioner was generally

cooperative and was oriented to person, place, time, and situation.   Dr. Kline observed

that Petitioner's insight and judgment were both fair, and Petitioner's flow of thought was

logical and goal-directed.   Petitioner described his mood to Dr. Kline as being somewhat

sad and depressed.   Dr. Kline observed no evidence of delusions of paranoia, grandiosity,

reference, or influence.   During the course of the interview, Dr. Kline opined that

Petitioner's intellect was in the low average range and that there was no apparent

interference with his ability to reason or comprehend information presented to him.   Dr.

Kline observed that Petitioner's concentration was grossly intact.

Dr. Kline determined that Petitioner suffered from symptoms of a major depressive

disorder that was of mild intensity.   He found that Petitioner responded to medication for

the disorder, but there was no evidence to suggest this disorder was present in the weeks

prior to the murders.   He opined that "[Petitioner] was clearly suffering from symptoms of

a substance induced psychosis at the time of the alleged criminal acts which resolved itself during his hospital stay after the events." ECF No. 10-2 at 13. Dr. Kline went on to report that "[i]t is clear that [Petitioner] took these substances on a voluntary basis and had at least some understanding that he was becoming intoxicated on them. While it is clear that he was suffering from hallucinations and delusions at the time of the alleged criminal acts, which were likely the impetus for his actions, it is also clear that these hallucinations and delusions arose directly from the presence of the dextromethorphan in his system." *Id.* at 16. Within a reasonable degree of medical certainty, Dr. Kline found that Petitioner did not suffer from a mental disease or defect at the time of the murders, but that he did suffer from hallucinations and delusions secondary to voluntary use of and intoxication on dextromethorphan.

**Guilty Plea**

On April 22, 2009, Petitioner was charged with two counts of class A felony murder in the first degree and one count of the unclassified felony of armed criminal action. The State indicated it would seek the death penalty. Based on Dr. Kline's report, plea counsel believed that Petitioner was competent to plead. On August 26, 2009, Petitioner pleaded guilty to two counts of murder in the first degree. As part of the plea bargain, the third count of felony armed criminal action was dismissed, and the State agreed it would not seek the death penalty, but instead would seek life imprisonment.

During his guilty plea, Petitioner admitted to the two murders, expressed his remorse, and stated that he understood the rights he was waiving by pleading guilty. The plea court asked Petitioner whether he was on medication and, when Petitioner indicated

he was, asked whether the medication made it difficult for Petitioner to understand the nature of the proceeding. Petitioner answered that it did not and asserted that he was not suffering from any mental condition that made it difficult for him to understand the proceeding and the implications thereof. The plea court accepted Petitioner's guilty plea (ECF No. 8, Ex. A, at 9), and on October 29, 2009, Petitioner was sentenced to life in prison without possibility of parole for each count of murder in the first degree. Petitioner did not directly appeal his convictions.

**State Post-Conviction Proceedings**

On August 17, 2010, Petitioner, through appointed counsel, filed a Missouri Supreme Court Rule 24.035 amended motion seeking post-conviction relief and raising the same claims as those contained in this habeas action. Petitioner claimed that plea counsel was ineffective because he hired a forensic psychologist rather than a forensic psychiatrist to establish that Petitioner was incompetent to plead guilty, and that on the date of the murders, he suffered from a mental defect or disorder that prevented him from having the intent necessary to commit first-degree murder.

In support of his claims, Petitioner relied on the written report of Ansell E. Daniel, M.D., a forensic psychiatrist. Dr. Daniel performed examinations of Petitioner on June 14 and 22, 2010, and July 1, 2010. ECF No. 10-1. Dr. Daniel's report contains the following information. The purpose of Dr. Daniel's evaluations of Petitioner were to determine, inter alia, whether Petitioner suffered from a mental disease or defect at the time of the evaluations, whether he suffered from a mental disease or defect at the time of the murders, whether he was competent to plea bargain at the time the plea was offered to him,

and whether he was competent to proceed with motions for post-conviction relief. Dr. Daniel evaluated Petitioner for a total of about six hours and interviewed Petitioner's mother and grandmother. Dr. Daniel also reviewed a number of records, including medical records from the hospital and the jail.

During the evaluations of Petitioner, Dr. Daniel observed that Petitioner was generally oriented to time, place, and person and that Petitioner was alert and cooperative. Petitioner told Dr. Daniel that he had stopped taking medications about a month before. Dr. Daniel observed that Petitioner's mood was depressed and that he occasionally experienced flashbacks and morbid thoughts about death. Dr. Daniel concluded with a reasonable degree of medical certainty that Petitioner suffered from a psychotic disorder induced and caused by dextromethorphan. He opined that the psychotic disorder began in January 2009 after Petitioner began consuming large quantities of cold medicine tablets. The disorder was active at the time of the murders, and Dr. Daniel determined that the symptoms of psychosis persisted during Petitioner's hospitalization and continued during his incarceration at the jail and thereafter. Treatment of Petitioner's psychosis required heavy doses of antipsychotic medication (Risperdal and Haldol), a heavy dose of Ativan, and an antidepressant (Paxil or Celexa) over the course of approximately 18 months.

Dr. Daniel stated that psychosis induced by a substance generally resolves with the discontinuation of the offending agent and/or treatment with antipsychotic medication, with the psychosis lasting a maximum of six months. Dr. Daniel opined that in Petitioner's case, clinical evidence indicated that Petitioner was psychotic for 18 months,

which indicated an underlying psychotic disorder. Dr. Daniel opined that Petitioner was clearly psychotic and out of contact with reality at the time of the murders.

As to Petitioner's mental state at the time of the plea, Dr. Daniel reported that Petitioner did not recall the specifics of his meetings with plea counsel. Petitioner told Dr. Daniel that Petitioner was taking medications that "made him slow down, zombie-like and moody." *Id.* at 17. Dr. Daniel opined that the medications that Petitioner was taking at the time he pleaded guilty were at a dosage sufficient to blunt alertness, slow Petitioner's thinking, and cause short-term memory impairment. As a result, he "probably" suffered from substantial impairment of his sensorium, clarity in thinking, attention span, and registration and memory, precluding his ability to consider the pros and cons of the plea offer. Dr. Daniel opined that, as a result, it was unlikely Petitioner would have had the capacity to understand the charges against him or the implications of accepting or rejecting a plea agreement, nor would Petitioner have been unable to carefully evaluate his acceptance of the plea agreement. Dr. Daniel pointed out that Dr. Kline's report did not address the issue of Petitioner's competence to plead guilty and concluded that Petitioner:

> 1) Suffered from a mental disease or defect at the time of the offenses when he killed his wife and son as per the provisions of Chapter 552 RSMo (2000). As a result of the mental disease or defect, he did not know the nature, criminality and wrongfulness of his conduct and did not have the capacity to form the necessary intent to commit first degree murders.

> 2) Was not competent to plead guilty to the offenses in August, 2009. At the time when the plea bargain was offered to him by his attorney, he was heavily medicated with a combination of Risperdal and Ativan in doses far exceeding the usual therapeutic range. Under this heavily medicated state, he was substantially impaired in his ability to knowingly and voluntarily consider implications of such an offer and make a rational judgment.

*Id.* at 18.

On April 19, 2012, the motion court[2] held an evidentiary hearing on Petitioner's motion for post-conviction relief, at which Dr. Daniel, Petitioner's grandmother, plea counsel, and law enforcement witnesses testified. Dr. Daniel testified consistent with his written report. He also testified that psychiatrists differ from psychologists in several respects. Psychiatrists hold medical degrees and undergo in-depth training regarding indications, side effects, and dosage of medications because they have the ability to prescribe medicine to patients. Psychologists, on the other hand, typically hold a Ph.D. and are unable to prescribe medicine. This distinction, Dr. Daniel opined, was relevant in Petitioner's case because a psychologist would be more able to identify whether Petitioner's competence to plead was impaired due to excessive medication. He did, however, concede that he would expect Dr. Kline to identify certain symptoms of over-medication, such as sedation. ECF No. 8, Ex. B, at 154-56.

The law enforcement witnesses testified about the scene of the murders and Petitioner's demeanor after he was taken into custody. Specifically, the police witnesses established that various portions of the home were in disarray with pools of blood on the floor, a bloody knife, and numerous bullet holes in the wall. The walls were covered with handwritings that appeared to be written in blood, including "Lucifer" and "Michael the Arch Angel." After Petitioner was taken into custody, he made several biblical references and referred to his son as "Lucifer."

Petitioner's grandmother testified that Petitioner had a good sense of humor as a child and that she had a good relationship with him. She testified that Petitioner loved his

_____

[2] The same judge presided over both the plea hearing and the postconviction evidentiary hearing.

wife and son and that she would visit Petitioner and his family approximately every week. Petitioner's grandmother continued to visit Petitioner regularly after he was incarcerated, and she testified that between Petitioner's initial incarceration through sentencing, he seemed unable to focus when on medication. She also testified that at his sentencing, Petitioner did not seem like himself.

Plea counsel testified as follows. Plea counsel was initially concerned about Petitioner's mental state and considered the possibility that Petitioner might not be competent to proceed with a plea agreement or trial. Plea counsel also wanted to investigate whether the defenses of not guilty by reason of insanity ("NGRI") or diminished capacity were available to Petitioner. As a result, plea counsel engaged Dr. Kline to examine Petitioner in June 2009. Plea counsel gave Dr. Kline general instructions to examine Petitioner's mental health and competency, but did not specifically direct Dr. Kline to evaluate the potential defenses. ECF No. 8, Ex. B. at 74-75. Plea counsel did not specifically inform Dr. Kline that Petitioner was taking Risperdal, Lorazepam, Paxil, and Ativan, although Dr. Kline reviewed Petitioner's records from the hospital.

Plea counsel testified that he discussed Dr. Kline's report and its impact on possible defenses with Petitioner. ECF No. 8, Ex. A at 47. Plea counsel also discussed the NGRI and diminished capacity defenses with colleagues at the Capital Division of the Missouri State Public Defender system. ECF No. 8, Ex. B at 80. The attorneys he consulted did not believe either defense was a "real possibility." *Id*. This was in line with plea

counsel's understanding of Missouri law, which forecloses an insanity defense where the intoxication was voluntary.

Plea counsel testified that a risk of obtaining a second opinion regarding Petitioner's mental state was that it would bolster the unfavorable opinion of Dr. Kline, strengthen the State's case against Petitioner, and hurt Petitioner's ability to negotiate a plea agreement. *Id.* at 102-103. Plea counsel continued to negotiate with the State for the lesser charge of murder in the second degree, which was unsuccessful. The State told plea counsel that, if the charges went to trial, the State would pursue the death penalty. *Id.* at 81. Given the facts of the case, particularly that Petitioner's infant son was one of the victims, plea counsel believed a sentence of death was a likely outcome of a jury trial, and he informed Petitioner about his concerns. He also believed, based on Dr. Kline's evaluation, that the NGRI and diminished capacity defenses were not available to Petitioner because his mental state arose from voluntary intoxication.

Plea counsel described Petitioner's indecision regarding his guilty plea, but stated that he had no reason to believe Petitioner was not lucid, which the motion court held was consistent with Dr. Kline's observations of Petitioner. Plea counsel testified that ultimately, Petitioner decided to plead guilty to spare the victims' family members the ordeal of a trial.

On October 15, 2012, the motion court, which had also presided over Petitioner's plea hearing, rejected Petitioner's claims. It first determined that the decision to engage a psychologist rather than a psychiatrist was not unreasonable strategy, since Mo. Rev. Stat. § 552 authorizes the appointment of either a psychologist or psychiatrist to conduct

examinations and render opinions regarding an accused's mental health. It found that plea counsel exercised the customary skill and diligence that a reasonably competent attorney would exercise in similar circumstances. ECF No. 8, Ex. C at 54.

The motion court further noted that both Dr. Kline and Dr. Daniel diagnosed Petitioner with a substance-induced psychosis, the symptoms of which caused Petitioner's criminal conduct. The motion court held, however, that Dr. Daniel's conclusion that Petitioner suffered from a mental disease or defect at the time he killed his wife and son, thereby negating the capacity to form the necessary intent to commit first degree murder, was not consistent with Missouri law. Instead, the motion court found that Petitioner's psychosis was the result of Petitioner's voluntary intoxication, not a separate underlying mental disease or defect, which effectively negated an NGRI or diminished capacity defense. As a result, plea counsel's decision not to pursue these defenses was sound and reasonable case strategy, and there was no prejudice to Petitioner because there is no evidence that "the outcome in the case would have been different" had those defenses been presented and ultimately rejected by the court.[3]

---

[3]     The plea court cited the second, or prejudice, prong of the *Strickland* test. As articulated by the United States Supreme Court and set forth more fully in the discussion section of this opinion:

> To establish prejudice under Strickland, a defendant must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Strickland made clear that the "result of the proceeding" refers to the outcome of the defendant's criminal prosecution as a whole. It defined "reasonable probability" as "a probability sufficient to undermine confidence in the outcome." And it explained that "[a]n error by counsel ... does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment."

As to Petitioner's alleged incompetence to plead, the motion court found credible Dr. Kline's June 2009 observations of Petitioner, which led Dr. Kline to determine that there was no apparent interference with Petitioner's ability to reason or comprehend information that was presented to him.   The motion court pointed to Dr. Daniel's testimony where he conceded that Dr. Kline, as a forensic psychologist, would have been able to identify some behaviors, such as sedation, that indicated excessive medication. The motion court held that Dr. Kline made no such observations.   The motion court concluded that Dr. Kline's observations, much closer in time to Petitioner's plea and consistent with plea counsel's observations of Petitioner, were more credible and compelling than those of Dr. Daniel.

Furthermore, the motion court relied on its own observations of Petitioner at the plea hearing.   The motion court stated that "[w]hile [Petitioner's] demeanor at the plea hearing was consistent with someone distraught or depressed, which would be understandable and reasonably expected demeanor under the circumstances, the Court observed that [Petitioner] appeared to understand the Court's questions during the plea hearing and responded appropriately, and did not appear to be impaired under the influence of any medication."   ECF No. 8, Ex. A, at 57.    As a result, the motion court determined that Petitioner's plea was made knowingly and voluntarily.

**State Post-Conviction Appeal**

Petitioner filed a timely appeal, which was denied by the Missouri Court of Appeals on November 26, 2013.   With regard to Petitioner's competency to plead, the appellate

_Lee v. United States,_ 137 S. Ct. 1958, 1969–70 (2017) (internal citations and quotations omitted).

court held that plea counsel had no reason to seek an additional competency evaluation in light of the fact that neither plea counsel nor Dr. Kline observed anything suggesting that Petitioner lacked the ability to consult with counsel with a reasonable degree of rational understanding, or lacked a rational and factual understanding of the charges against him. ECF No. 8, Ex. E at 9.   The appellate court, like the motion court, held that the fact that plea counsel failed to seek a psychiatrist who would find Petitioner incompetent did not constitute ineffective assistance of counsel in light of Mo. Rev. Stat. § 552.020.2, which permits a psychiatrist or a psychologist to examine a defendant for purposes of determining whether he is competent to proceed with a plea.[4]  *Id*.   The appellate court held that Petitioner failed to prove that plea counsel failed to exercise the customary skill and diligence of a reasonably competent attorney under similar circumstances, so it did not evaluate whether plea counsel's deficient performance prejudiced Petitioner under *Strickland v. Washington*, 466 U.S. 668, 686 (1984).

The appellate court also rejected Petitioner's claim that plea counsel should have retained a forensic psychiatrist to establish that Petitioner did not have the capacity to form the necessary intent to commit first-degree murder.[5]  The appellate court found that the evidence showed that Petitioner was likely in a drugged condition at the time of the incident, and it relied upon Dr. Kline's report that opined that Petitioner's psychosis did not

---

[4]     Mo. Rev. Stat. 552.020.2 provides, in relevant part, that "[w]henever any judge has reasonable cause to believe that the accused lacks mental fitness to proceed, he shall . . . appoint one or more private psychiatrists or psychologists . . . for purposes of performing the examination in question, to examine the accused."

[5]     "A person commits the offense of murder in the first degree if he or she knowingly causes the death of another person after deliberation upon the matter."   Mo. Rev. Stat. § 565.020.1.

exist independently from Petitioner's drug use. The appellate court pointed out that even Dr. Daniel testified that Petitioner's psychosis was the result of his abuse of dextromethorphan. As a result, the appellate court concluded that Petitioner's voluntary drug use made a diminished capacity or NGRI defense unavailable to him under Missouri law. ECF No. 8, Ex. E at 9-10.

## Federal Habeas Petition

Petitioner submitted a timely petition for federal habeas corpus relief to the Court on May 15, 2014. Petitioner raises claims of ineffective assistance of counsel arguing that counsel should have retained a forensic psychiatrist to establish both that he was not competent to enter a plea and lacked the capacity to form the requisite intent. Respondent contends that federal habeas relief must be denied because the state courts' adjudication of Petitioner's claims was legally and factually reasonable.

## DISCUSSION

Where a claim has been adjudicated on the merits in state court, the Antiterrorism and Effective Death Penalty Act ("AEDPA") provides that application for a writ of habeas corpus cannot be granted unless the state court's adjudication:

1) Resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or,

2) Resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. §2254(d).

"[C]learly established Federal law" for purposes of §2254(d)(1) includes only the holdings, as opposed to the dicta, of [the Supreme Court's] decisions. And an 'unreasonable application of' those holdings must be objectively unreasonable, not

merely wrong; even clear error will not suffice. To satisfy this high bar, a habeas petitioner is required to show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (citations omitted).

## Assistance of Counsel

The Sixth Amendment guarantees a criminal defendant the right to effective assistance of counsel. *Strickland*, 466 U.S. at 686. To establish ineffective assistance of counsel, a petitioner must satisfy a two prong test. The petitioner must demonstrate that counsel's performance was "deficient" and that such deficient performance "prejudiced" his defense. *Id.* at 687. In evaluating the performance prong of the *Strickland* test, the basic inquiry is "whether counsel's assistance was reasonable considering all the circumstances." *Id.* at 688. Rather than second-guessing counsel's actions with the benefit of hindsight, the reviewing court must examine counsel's conduct with a high degree of deference. *Id.* at 689.

In the context of a guilty plea, the prejudice prong requires that there is a reasonable probability that, but for counsel's errors, the petitioner would not have pled guilty and would have insisted on going to trial. *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). With respect to advice on potential affirmative defenses, "the resolution of the 'prejudice' inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial." *Id.*

When, as here, an ineffective assistance claim has been addressed by the state courts, this Court must bear in mind that "[t]aken together, AEDPA and *Strickland*

15

establish a doubly deferential standard of review." *See Williams v. Roper*, 695 F.3d 825, 831 (8th Cir. 2012). It is not sufficient for a petitioner to "show that he would have satisfied *Strickland*'s test if his claim were being analyzed in the first instance." *Bell v. Cone*, 535 U.S. 685, 698-99 (2002). "Rather, he must show that the [state courts] applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Id*. at 699.

## I.    *Failure to hire a forensic psychiatrist to examine Petitioner's competence to plead.*

Petitioner's first claim of ineffective assistance of counsel stems from plea counsel's failure to hire a forensic psychiatrist to determine Petitioner's competence to plead guilty. Here, the state courts' determination that Petitioner failed to show ineffective assistance of counsel is supported by the record and does not contravene or unreasonably apply clearly established Supreme Court precedent.

As set forth above, plea counsel testified that he met with Petitioner on several occasions and was concerned regarding Petitioner's mental state. As a result, he hired a private psychologist, Dr. Kline, to evaluate Petitioner. Dr. Kline did so and found that Petitioner's insight and judgment were both fair, observing no apparent interference with Petitioner's ability to reason or comprehend information.

"Counsel is not required to 'continue looking for experts just because the one he has consulted gave an unfavorable opinion.'" *Walls v. Bowersox*, 151 F.3d 827, 835 (8th Cir. 1998) (quoting *Sidebottom v. Delo*, 46 F.3d 744, 753 (8th Cir. 1995)). Courts have consistently held that counsel's reliance on a single psychological evaluation, coupled with counsel's own perceptions of the defendant's competency, meets the *Strickland* standard for reasonableness. *See, e.g., O'Neal v. Delo*, 44 F.3d 655, 660 (8th Cir. 1995) (finding no

ineffective assistance of trial counsel where "there is no evidence in the record that [Petitioner] exhibited any behavior or other indicia of an abnormal mental state such that counsel could not reasonably decide to proceed without further psychiatric testing"); *Galowski v. Berge*, 78 F.3d 1176, 1180 (7th Cir. 1996) (finding that, when counsel had concerns about the defendant's competence, it was appropriate to retain an expert, but not incumbent to request a competency hearing after the expert "quieted the misgivings").

The state courts found that plea counsel was not ineffective for hiring a psychologist, rather than a forensic psychiatrist, to establish that Petitioner was incompetent to proceed with trial or a plea deal. As they pointed out, under Missouri law, an evaluation of a defendant's competency to stand trial can be done by either a psychiatrist or a psychologist. Further, Petitioner cites no legal authority for the proposition that plea counsel should have hired a forensic psychiatrist. *See, e.g.*, *Forsyth v. Ault*, 537 F.3d 887, 893 (8th Cir. 2008) ("[the petitioner] presents neither a factual basis for differentiating categorically between clinical and forensic psychiatrists or psychologists nor any legal authority for this proposition.").

Here, the motion court reasonably held that plea counsel's performance was adequate. Specifically, the motion court determined that plea counsel consulted and relied upon an expert who addressed plea counsel's concerns about Petitioner's mental state and confirmed plea counsel's personal observations of Petitioner. It was reasonable for the motion court to determine that plea counsel's reliance on a single psychological evaluation, coupled with plea counsel's own perceptions of Petitioner's competency, met the *Strickland* standard for reasonableness. Furthermore, the court's observations were

consistent with that of plea counsel, who stated that he thought Petitioner understood when plea counsel discussed Dr. Kline's evaluation and its impact on available defenses with Petitioner.

In addition to arguing that plea counsel was ineffective for failing to hire a psychiatrist, Petitioner claims that, regardless of Petitioner's competency to plead, plea counsel was ineffective for failing to inform him of the diminished capacity or NGRI defenses before Petitioner pled guilty. Petitioner claims that had he known that those defenses were available to him, he would have gone to trial or sought a lesser sentence. He argues that as a result, he satisfied the second, or prejudice, prong of the *Strickland* test.

In the context of a guilty plea and advice with respect to a potential affirmative defense, "the resolution of the 'prejudice' inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial." *Hill*, 474 U.S. at 59; *see also Sidebottom*, 46 F.3d at 725 (finding no ineffective assistance when counsel, relying on a psychological report, numerous meetings with the petitioner, and a lack of evidence to contradict the findings of a report, chose not to pursue a defense of diminished capacity). Petitioner's argument here is unavailing because, as discussed in more detail in the next section, the state courts reasonably held that those defenses were not available to Petitioner under Missouri law. In light of existing precedent and Dr. Kline's report, the state courts reasonably determined that plea counsel exercised reasonable professional judgment in deciding not to pursue those defenses because he believed that they would not have succeeded at trial. Petitioner cannot establish that he was prejudiced by plea counsel's

decision not to pursue these defenses, thereby failing the second prong of the *Strickland* test.

## II.      *Petitioner's competency to plead*

Although not expressly set forth in Petitioner's habeas petition, inherent in his claims of ineffective assistance of counsel is a claim that Petitioner was, in fact, incompetent to plead.    Due process requires that a defendant be competent to plead guilty. *Hunter v. Bowersox*, 172 F.3d 1016, 1020 (8th Cir. 1999).    A criminal defendant's wavier of the right to stand trial and plead guilty must have been done "knowingly and voluntarily."    *Godinez v. Moran*, 509 U.S. 389, 400 (1993).    This requirement ensures that a defendant "understand[s] the significance and consequences of a particular decision."    *Id.* at 401.    Whether a plea of guilty was voluntary is a question of federal law, but the state courts' determinations on the merits of a factual issue are entitled to a presumption of correctness on federal habeas review.    *Demosthenes v. Baal*, 495 U.S. 731, 735 (1990); *Hunter*, 172 F.3d at 1022; *Reynolds v. Norris*, 86 F.3d 796, 800 (8th Cir. 1996) ("On habeas review of a substantive competency claim, this court generally presumes that a state court's factual finding of competency is correct.").

The state courts reasonably concluded that, in light of the evidence presented in the state court proceedings, Petitioner was competent to plead.    The motion court incorporated into its findings of fact its observations of Petitioner's demeanor during the plea hearing.    Specifically, it found that Petitioner's demeanor was consistent with someone distraught and distressed, which would be understandable and reasonably expected under the circumstances.    ECF No. 8, Ex. A at 57.    It noted that Petitioner

appeared to understand the Court's questions during the plea hearing and respond appropriately. As a result, the motion court confirmed its determination at the plea hearing that Petitioner's pleas of guilty were voluntary and that Petitioner did not demonstrate prejudice by reason of plea counsel's actions. ECF No. 8, Ex. A at 57.

Furthermore, "[t]he deference owed to the state trial court pursuant to § 2254(e)(1) includes deference to its credibility determinations." *Smulls v. Roper*, 535 F.3d 853, 864 (8th Cir. 2008). Findings of fact in state court are presumed correct, and a federal court is not to substitute its judgment as to the credibility of witnesses for that of the state court. *Ingrassia v. Armontrout*, 902 F.2d 1368, 1370 (8th Cir. 1990). Here, the Court defers to the state court's reasonable determination that Dr. Kline's observations were more credible and compelling than those of Dr. Daniel, particularly when considered with plea counsel's testimony that he believed Petitioner was competent to enter the plea, as well as the trial court's own observations at the plea hearing.

### III. *Failure to hire a forensic psychiatrist to examine Petitioner's capacity to form the necessary intent to commit first-degree murder.*

Petitioner argues that plea counsel was ineffective for failing to hire a forensic psychiatrist to examine Petitioner's capacity, at the time of the murders, to form the intent necessary to commit first degree murder. Had plea counsel done so, Petitioner claims the forensic psychiatrist would have established that Petitioner was suffering from psychosis that existed independently from his drug abuse, which in turn constitutes a mental disease or defect. As a result, Petitioner argues he could have then asserted an NGRI or diminished capacity defense. ECF No. 1 at 6.

Respondent contends that Petitioner's claim fails because his own expert, a forensic psychiatrist, agreed with Dr. Kline that Petitioner's psychosis was the result of his abuse of dextromethorphan. Respondent notes that under Missouri law, voluntary drug-induced psychosis cannot constitute the basis of an NGRI or diminished capacity defense. ECF No. 7 at 12. As a result, the retention of a forensic psychiatrist, like Dr. Daniel, would not have changed the fact that the defenses were unavailable to Petitioner.

As noted above, Mo. Rev. Stat. § 565.020.1 defines the crime of first-degree murder as knowingly, and with deliberation, causing the death of another person. *See State v. Meine*, 469 S.W.3d 491, 495 (Mo. Ct. App. 2015). Missouri law permits evidence of drug abuse with psychosis to establish that a defendant suffered from a mental defect and, as a result, did not have the requisite state of mind to commit an element of the offense. *State v. Wright*, 376 S.W.3d 696, 701 (Mo. Ct. App. 2012); Mo. Rev. Stat. §§ 552.010, 552.015(8). [6] However, "drug-induced intoxication, even when it results in psychosis, does not constitute a mental disease or defect where the psychosis was caused by voluntary drug use." *Id.* at 702. In other words, absent a separate mental disease, voluntary intoxication cannot provide an insanity defense. *See State v. Rhodes*, 988 S.W.2d 521, 526 (Mo. 1999) (voluntary intoxication and first degree murder).

Under *Strickland*, counsel is not required to "investigate every conceivable line of mitigating evidence." *Wiggins v. Smith*, 539 U.S. 510, 533 (2003) (discussing mitigating

---

[6] Mo. Rev. Stat. § 552.015.2(8) provides that evidence that a defendant did nor did not suffer from a mental disease or defect shall be admissible in a criminal proceeding "to prove that the defendant did or did not have the state of mind which is an element of the offense." Under Mo. Rev. Stat. 552.010, the term "mental disease or defect" does not include "drug abuse without psychosis."

evidence at a sentencing hearing after trial).   Counsel had a duty only to make "reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary" in line with "reasonable professional judgments."   *Strickland*, 466 U.S. at 691.   Here, the state courts held that plea counsel's efforts to hire a forensic psychologist rather than a forensic psychiatrist to determine Petitioner's mental state at the time of the murders did not constitute ineffective assistance of counsel under *Strickland*.   In light of the evidence presented in the state court proceedings, the state courts reasonably determined that plea counsel's engagement of a private psychologist was "sound strategy " and the engagement of a psychologist, as opposed to a psychiatrist, evinced "customary skill" as required by *Strickland*'s first prong.   ECF No. 8, Ex. A, at 55.

Furthermore, Dr. Kline's report opined that Petitioner's psychosis did not exist independently from his voluntary drug use.   "[T]he law is well-established that a lawyer who hires a qualified mental health expert is not ineffective in relying on that expert's opinion unless the lawyer has reason to doubt the expert's competence."   *Marcrum v. Luebbers*, 509 F.3d 489, 505 (8th Cir. 2007) (holding that counsel's decision to hire a clinical psychologist to evaluate the petitioner or to proceed to trial on the basis of that psychologist's interpretation of the medical record did not fall below the standard of performance dictated by the Sixth Amendment).   Here, the state courts' determination that plea counsel reasonably relied on Dr. Kline's report and exercised sound litigation strategy when he chose not to retain another expert in the pursuit of a seemingly meritless defense was reasonable.   *See Thomas v. United States*, 951 F.2d 902, 905 (8th Cir. 1991) ("Counsel's failure to raise [] meritless issues does not constitute ineffective assistance.").

The Court finds that it was reasonable for the state courts to determine that plea counsel's decision not to present the NGRI and diminished capacity defenses to the trial court because they had no merit did not constitute ineffective assistance of counsel.

## CONCLUSION

The Court concludes that Petitioner is not entitled to federal habeas relief. The Court does not believe that reasonable jurists might find the Court's assessment of the procedural or substantive issues presented in this case debatable or wrong, for purposes of issuing a Certificate of Appealability under 28 U.S.C. § 2253(c)(2). *See Buck v. Davis*, 137 S. Ct. 759, 773 (2017) (standard for issuing a Certificate of Appealability) (citing *Miller–El v. Cockrell*, 537 U.S. 322, 336 (2003)).

Accordingly,

**IT IS HEREBY ORDERED** that the petition of Christopher Piersee for a writ of habeas corpus relief is **DENIED**. ECF No. 1.

**IT IS FURTHER ORDERED** that a certificate of appealability shall not be issued. A separate Judgment shall accompany this Memorandum and Order.

_____
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 11th day of August, 2017.